## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                    No. CR 14-3095 JB

BRIAN J. JUANICO,

        Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Presentence Investigation Report, disclosed March 25, 2015. The Court held a hearing on April 23, 2015. The primary issue is what fine to impose upon Defendant Brian J. Juanico, who has a total net worth of $95,347.00, but also must make child support and other payments on his existing assets. The Court will impose a fine of $53,423.55, payable in thirty-six monthly installments of $1,484.00, and will defer payment of the fine until Juanico begins supervised release.

### FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report (disclosed March 25, 2015)("PSR"), which the United States Probation Office ("USPO") prepared. The Court will first outline the facts of Juanico's offense. It will then briefly describe Juanico's financial condition.

1.    **The Offense of Conviction.**

On April 6, 2014, Juanico assaulted and strangled his "on and off" girlfriend, Jane Doe. PSR ¶¶ 8, 12 at 4, 5. Juanico and Doe were separated at the time of the offense -- Doe came to his house to pick up her daughter. See PSR ¶ 12, at 5. Doe later stated that Juanico strangled her

until she felt that she "was going to die and not see her children again." PSR ¶ 13, at 5. After Juanico released his grip, Doe began to scream, and he "grabbed her face, putting both his thumbs in her mouth toward the back of her throat." PSR ¶ 14, at 6. He tore off her clothes, threatened her with a golf club, and threatened to shoot her with a gun he kept in the living room. See PSR ¶ 14, at 6.

Both Juanico and Doe are members of the Acoma Indian Tribe, and the assault took place within the Acoma Indian Reservation in Cibola County, New Mexico. See PSR ¶ 8-9, at 4-5. On April 7, 2014, Doe contacted an Acoma Tribal Police officer, who took photographs of significant injuries to her neck and arms. See PSR ¶ 9, at 5. Tribal authorities arrested Juanico on May 1, 2014. See PSR ¶ 11, at 5.

**2.      Juanico's Financial Condition.**

The Court understands that the only ruling that Juanico intends to appeal is the Court's imposition of a fine. Juanico's financial condition is important to that decision. Accordingly, the Court will discuss his ability to pay child support, his education, his employment, his assets, and his liabilities.

**a.      Child Support.**

Juanico says that, before his arrest, he was paying a total of roughly $400.00 each month in child support for his oldest daughters, Tianna, age 16 and Tylenne, age 14. See PSR ¶ 87, at 18. He last saw these children in 2002. See PSR ¶ 57, at 14. When he is released, he will be required to support three other minor children: two sons, ages 10 and 15, and one daughter, age 12. See PSR ¶¶ 59, 87, at 14, 18.

b.      **Education and Employment.**

Juanico graduated from Grants High School in Grants, New Mexico on May 19, 1995. See PSR ¶ 74, at 16.  He was ranked twenty-second out of 145 students and participated in the school's Reserve Officers' Training Corps ("ROTC") program.  PSR ¶ 74, at 16.  From July 31, 1995 to September 26, 1995, Juanico studied diesel mechanics at the Universal Technical Institute in Phoenix, Arizona.  See PSR ¶ 75, at 16.  Although he dropped out of the program, he has specialized skills as a mechanic and a commercial driver's license.  See PSR ¶ 75-76, at 16.

Juanico is currently unemployed.  See PSR ¶ 87, at 18.  He began working as a mechanic in 1995 and has held numerous positions as a mechanic throughout New Mexico.  See PSR ¶¶ 74, at 16.  At the time of his arrest, Juanico worked as a mechanic and welder, earning an annual salary of $55,286.40.  See PSR ¶ 78, at 17.  After his arrest, he held a similar job until he changed his plea on January 23, 2015.  See PSR ¶ 77, at 16.

c.      **Assets and Liabilities.**

The USPO reports that Juanico owns a mobile home worth $130,000.00, and three vehicles: (i) a 1991 Nissan pickup worth $800.00; (ii) a 2002 Ford F-350 pickup worth $12,000.00; and (iii) a 2013 Ford F-150 pickup worth $20,000.00.  See PSR ¶ 88, at 18.  He also owns mechanic tools worth $5,000.00 and has a 401(k) retirement savings account with Vanguard-Peabody worth $23,000.00.  See PSR ¶ 88, at 18-19.  His assets, overall, are worth $190,800.00.  See PSR ¶ 88, at 18-19.  His liabilities, including his mobile home loan, vehicle loans, personal loans, and collection accounts amount to $95,453.00.  See PSR ¶ 88, at 18-19. His net worth is therefore $95,347.00.  See PSR ¶ 88, at 18-19.

## PROCEDURAL BACKGROUND

On January 23, 2015, Juanico pled guilty, without a plea agreement, to three separate counts of assault of an intimate partner by strangling or suffocation under 18 U.S.C. §§ 1153 and 113(a)(8).  See Plea Minute Sheet, filed January 23, 2015 (Doc. 34); PSR at 1.  The parties do not dispute the PSR's calculations for Juanico's base offense level or applicable Guidelines range.  See United States' Sentencing Memorandum at 1, filed April 16, 2015 (Doc. 37)("The United States has no objection to the facts, calculations, or analysis contained in the PSR."); Sentencing Memorandum on Behalf of Brian Juanico, filed April 20, 2015 (Doc. 39).

This case involves both incarceration and monetary sanctions against Juanico.  As to imprisonment, the USPO states that Juanico's base offense level under the Guidelines should be 14.  See PSR ¶ 27, at 8 (citing U.S.S.G. §§ 2X5.1 and 2A2.2).  It applied a 3-level enhancement for the threatened use of a deadly weapon, namely the golf club and firearm.  See PSR ¶ 28, at 8 (citing U.S.S.G. § 2A2.2(b)(2)(C)).  It added a 4-level enhancement for an injury between "bodily injury" and "serious bodily injury" pursuant to U.S.S.G. § 2A2.2(b)(3)(D).  PSR ¶ 29, at 9.  Finally, it included a 2-level enhancement, because Juanico restrained the victim during the course of the offense.  See PSR ¶ 30, at 9 (citing U.S.S.G. § 3A1.3).  Because Juanico pled guilty and "clearly demonstrated acceptance of responsibility," the PSR decreased the offense level by 3 levels.  PSR ¶ 35-36, at 9-10 (citing U.S.S.G. § 3E1.1(a)-(b)).  It calculated a total offense level of 20, see PSR ¶ 37, at 10, which, when combined with his criminal history category of I, see PSR ¶ 44, at 11, results in a Guidelines imprisonment range of 33 to 41 months, see PSR ¶ 91, at 19.

The PSR states that Juanico faces mandatory special assessments of $100.00 for each of his three counts of conviction.  See PSR ¶ 99, at 20.  It also states that he faces discretionary

fines on each count and that the statutory maximum for each is $250,000.00.  See PSR ¶ 98, at 20 (citing 18 U.S.C. § 3571(b)).  It says that the Guidelines indicate a total fine range -- for all Counts combined -- of $7,500.00 to $75,000.00.  See PSR ¶ 100, at 20 (citing U.S.S.G. § 5E1.2(c)(3)).  The PSR also states that, while Juanico does not owe restitution in this case because the victim has not requested it, see PSR ¶¶ 102-03, at 20 (citing 18 U.S.C. § 3663A), he owes the United States the costs of its prosecution, which the USPO calculates to be $2,440.97 per month while he is in Bureau of Prisons ("BOP") facilities, $2,217.73 per month while he is in community correction centers, and $263.50 per month, or $3,162.03 per year, while he is on supervised release, see PSR ¶ 101, at 20 (citing 18 U.S.C. § 3572(a)(6); U.S.S.G. § 5E1.2(d)(7)).

The Court held a sentencing hearing on April 23, 2015.  See Transcript of Hearing, filed May 13, 2015 (Doc. 48)(taken Apr. 23, 2015)("Tr.").  The Court announced its intent to levy a fine before imposing sentence, noting that Juanico "has more assets than many people that appear before the Court."  Tr. at 12: 3-6 (Court).  Juanico replied that he had more assets than most defendants, but that he had worked very hard to obtain them.  See Tr. at 12:7-9 (Rivas).  He added that he would have to sell many of his assets, including his mobile home, and that he had a continuing obligation to pay child support.  See Tr. at 12: 9-15 (Rivas).

The Court then stated the sentence.  See Tr. at 25:7-9 (Court).  The Court indicated that sixteen factors put downward pressure on the Guidelines range.  First are Juanico's unique characteristics.  The Court noted that Juanico is an "educated person . . . a trained person."  Tr. at 26:17-18 (Court).  The Court stated that the letters to the Court on Juanico's behalf and the PSR indicated that he has worked very hard in his life.  See Tr. at 26:18-19 (Court).  The Court explained that, with some intervention, Juanico could "do well."  Tr. at 26:21 (Court).

The Court varied the equivalent of 5 offense levels, producing a working offense level of 15 and a criminal history category of I, resulting in a working Guidelines range of 18 to 24 months.  See Tr. at 31:15-23 (Court).  It sentenced Juanico to 18-months imprisonment, at the low end of this recalculated working range.  See Tr. at 32:3-15 (Court).  Most importantly for this Memorandum Opinion and Order, the Court explained that it would "impose a fine in this case, and the fine is going to be punitive because it's going to cover the cost of the incarceration, the cost to taxpayers.  I think that can also substitute for some incarceration here."  Tr. at 26:22-27:1 (Court).  The Court expressly noted that the ability to impose a fine put downward pressure on the Guidelines sentence.  See Tr. at 31:20-23 (Court).

Juanico's primary argument is that the state courts would not impose a sentence of more than time served for domestic violence.  See Tr. at 7:6-15 (Rivas).  The Court noted that the unwarranted disparities that the Court was trying to avoid were not with state courts, but with other federal courts.  See Tr. at 27:1-4 (Court).  The Court noted that Congress had passed the Violence Against Women Act, 18 U.S.C. §§ 2261-66, 42 U.S.C. §§ 13701-14040, and imposed "specific expectations of courts and prosecutors, and now on people on the reservation, as to how domestic violence will be treated in federal court and on the reservations."  Tr. at 27:4-9 (Court). The Court noted, however, that it is still cognizant of what goes on across the street when the state courts have domestic violence cases.  See Tr. at 27:10-11 (Court).  The Court stated that, given the world in which this federal court sits, and given the sentences that people are seeing for domestic violence, this sentence is likely going to be greater than anything that the state probably would have given for the same offense.  See Tr. at 27:11-15 (Court).  The Court stated that this reality continues to put some downward pressure on the Guidelines sentence.  See Tr. at 27:15-16 (Court).

The Court noted that Juanico has good family support, that he seems to have been raised well, that he had a good upbringing, that he has good qualities, that he has been compassionate, and that he has done some things that indicate he can be a productive member of society -- traits that are often absent when the Court sentences defendants, from on and off the reservations.  See Tr. at 27:17-28:5 (Court).  Doe recognizes that Juanico has good qualities.  See Tr. at 23:21-22 (Doe)("I've told our kids that you've made mistakes that you've made bad choices, but you're not a bad person.").  The Court noted that, outside of drinking and anger management within the domestic household, he is probably a very calm, caring, and loving person.  It stated that "through sports, hard work, [and] good grades, he's achieved a lot."  Tr. at 28:4-5 (Court).

The Court noted that Juanico has accepted responsibility for his conduct and that he realizes that he has made a terrible mistake.  See Tr. at 28:6-8 (Court).  The Court said that it can use supervised release to deal with the drinking and the anger problems.  See Tr. at 28:8-10 (Court).  The Court said that this prediction put downward pressure on the sentence.  It also noted that he had done well on pretrial release here in the community of Albuquerque, New Mexico -- off the reservation -- and that it thus had high expectations that he would do well with supervised release as well.  See Tr. at 28:13-16 (Court).

The Court noted that Juanico is now thirty-seven years old, and committed a couple of offenses at nineteen years old and then one at twenty-four years old.  See Tr. at 18:17-20 (Court).  The Court recognized that there was a gap in his criminal history.  See Tr. at 28:20-21 (Court).  The Court noted that employment did not look like a problem, emphasizing its importance to success after coming out of prison.  It explained that Juanico stays employed; although he moves from job to job, he seems to be getting better jobs.  See Tr. at 28:23-29:4.

The Court explicitly recognized that Juanico's children were going to suffer for his crime and the sentence that the Court gave him:

> He's going to miss his children, because he is going to serve some more time. But he is supporting financially his children, so his family is going to suffer a couple of ways. He's not going to be in their life for a while, and the children are going to suffer financially.

Tr. at 29: 6-11 (Court).

The Court again emphasized that, outside of the domestic household, there is not a great deal of need to protect the public except in the context -- a very important context -- of the family. The Court stated that it was not greatly concerned about Juanico's violent tendencies outside of the domestic household. See Tr. at 29:12-17 (Court).

After identifying these sixteen factors that put downward pressures on the sentence, the Court identified eleven factors that put upward pressure on the sentence to keep it within the Guidelines range. See Tr. at 31:1-14 (Court). In the end, the Court stated the fine:

> You've worked hard, you've assembled some assets, and so the fine is going to be punitive. And I thought it was somewhat of a substitute for increased incarceration. Because the defendant has financial resources, I think that he should pay for the cost of incarceration and supervised release rather than the taxpayers. And so the Court -- because of the defendant's financial resources, the Court is going to impose a fine of $53,423.55.

Tr. at 36:1-9 (Court). The Court explained that it arrived at that figure by adding the cost of 18 months of incarceration ($2,440.97 * 18 = $43,937.46) to the cost of three years of supervised release ($263.50 * 3 = $9,486.00). See Tr. at 36:9-13 (Court).

Juanico objected that "the amount that the Court imposes is approximately a year's salary. It's going to take a very long time to pay that money back." Tr. at 38: 6-11 (Rivas). The Court refused to lower the total fine, but proposed a payment schedule to the USPO. See Tr. at 38:14-21 (Adams, Court). The United States deferred to the Court on the fine's amount and any

payment plan.  See Tr. at 39:6-7 (Adams).  The USPO and the Court then worked out a payment

plan in which Juanico would not pay anything until supervised release begins, at which point he

would pay $1,484.00 per month over three years.  See Tr. at 39:8-40:1 (Court, Probation

Officer).

      Juanico thanked the Court for the payment schedule, but noted that

> [$]1,484 can be a mortgage on a fairly substantial size home.  It's the amount of
> money that some people use to live a whole month on . . . it may impinge on his
> ability to pay the child support and to, frankly, just support himself and have a
> place to stay and transportation.

Tr. at 40:2-14 (Rivas).  The Court declined to reduce the fine, noting that Juanico: (i) had

sufficient assets to pay the fine immediately; and (ii) was able to work and could secure a good

income.  See Tr. 40:15-21 (Court).  Neither party submitted any briefing or other written

argument on the appropriate fine.

## LAW REGARDING THE GUIDELINES

      In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States

severed the mandatory provisions from the Federal Sentencing Act, thus making Guidelines

sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the

remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and

sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate

courts, as they have in the past, in determining whether a sentence is unreasonable." 543 U.S. at

261.

      Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C.

§ 3553(a)(2):

     **(A)**     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     **(B)**     to afford adequate deterrence to criminal conduct;

     **(C)**     to protect the public from further crimes of the defendant; and

     **(D)**     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

     Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about

sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."   United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).   A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a).   See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."   United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).   This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.   See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).   Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory guideline sentence.   See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.   Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.   The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).

## LAW REGARDING THE IMPOSITION OF CRIMINAL FINES

There is a three-tier hierarchy of authority to which a district court must look when imposing a criminal fine.   At the top of the hierarchy, as always, is the Constitution of the United

States of America.  The Eighth Amendment to the Constitution of the United States contains an

Excessive Fines Clause, to which the appellate courts have given content over the years.[1]  See

---

[1]The right to be free from excessive fines is one of the few remaining rights that the Supreme Court has not incorporated against the states.  When the Bill of Rights was adopted, none of the rights within it applied against state governments.  See Barron v. Baltimore, 32 U.S. 243, 250 (1833)(Marshall, C.J.)(holding that the first ten "amendments contain no expression indicating an intention to apply them to the State governments" and that, thus, "[t]his court cannot so apply them").  Cf. U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion . . . ." (emphasis added)).  After the post-Civil War passage of the Fourteenth Amendment to the Constitution, however, the Supreme Court began using that Amendment's Due Process Clause, see U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." (emphasis added)), to "incorporate" the various individual liberties which the Bill of Rights contains against the states, e.g., McDonald v. City of Chicago, 561 U.S. 742, 752 (2010)(Alito, J.).

The Supreme Court did not incorporate the entire Bill of Rights in one fell swoop, however, but instead relied on a piecemeal process of "selective incorporation" -- basically, incorporating rights against the states one at a time, as the opportunities to do so arose. McDonald v. City of Chicago, 561 U.S. at 752.  The standard whether a Bill of Rights provision should be incorporated is whether the right is "implicit in the concept of ordered liberty," and "so rooted in the traditions and conscience of our people as to be ranked as fundamental." McDonald v. City of Chicago, Ill., 561 U.S. at 760.  See Washington v. Glucksberg, 521 U.S. 702, 721 (1997); Duncan v. Louisiana, 391 U.S. 145, 149 (1968); Palko v. Connecticut, 302 U.S. 319, 325 (1937).  To date, the Supreme Court has incorporated almost all of the Bill of Rights' provisions, including: the First Amendment to the Constitution's Free Speech Clause, see Gitlow v. New York, 268 U.S. 652, 666 (1925), its Free Exercise Clause, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), its Establishment Clause, see Everson v. Bd. of Educ., 330 U.S. 1, 16 (1947), and its guarantees of freedom of the press, see Near v. Minnesota, 283 U.S. 697, 707 (1931), freedom of assembly, see DeJonge v. Oregon, 299 U.S. 353, 365 (1937), and the right to petition the government for redress of grievances, see Edwards v. South Carolina, 372 U.S. 229, 237 (1963); the Second Amendment to the Constitution's right to bear arms, see McDonald v. City of Chicago, 561 U.S. at 742; the Fourth Amendment to the Constitution's right against unreasonable search and seizure, see Wolf v. Colorado, 338 U.S. 25, 27-28 (1949), its Warrant Clause, see Aguilar v. Texas, 378 U.S. 108, 110 (1964), and even, to some extent, its remedial gloss, the exclusionary rule, see Mapp v. Ohio, 367 U.S. 643, 655 (1961); the Fifth Amendment to the Constitution of the United States' privilege against self-incrimination, see Miranda v. Arizona, 348 U.S. 436, 467 (1966)(creating new anti-self-incrimination rights and immediately applying them against the states); Griffin v. California, 380 U.S. 609, 615 (1965)(applying pre-established anti-self-incrimination rights against the states), its Double Jeopardy Clause, see Benton v. Maryland, 395 U.S. 784, 796 (1969), and Takings Clause, see Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 258 (1897); the Sixth Amendment to the Constitution's rights to a public trial, see In re Oliver, 333 U.S. 257, 273 (1948), to assistance of counsel, see Gideon v. Wainwright, 372 U.S. 335, 343 (1963), to trial by jury, see Duncan v. Louisiana, 391 U.S. 145, 148-49 (1968), and to compulsory process, see Washington v. Texas,

- 12 -

388 U.S. 14, 19 (1967), and its Speedy Trial Clause, see Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967), and Confrontation Clause, see Pointer v. Texas, 380 U.S. 400, 403-04 (1965); and the Eighth Amendment's Cruel and Unusual Punishments Clause, see Robinson v. California, 370 U.S. 660, 666-67 (1962), and Excessive Bail Clause, see Schilb v. Kuebel, 404 U.S. 357, 365 (1971).

What remains is a collection of six rights that have either not been incorporated or whose incorporation is unclear. First, the Third Amendment to the Constitution's right to be free from quartering of soldiers in private homes, unsurprisingly, is not frequently invoked. The United States Court of Appeals for the Second Circuit has held that the Third Amendment is incorporated, and the Tenth Circuit has suggested that it is, but the Supreme Court has not addressed the issue. See United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988); Engblom v. Carey, 677 F.2d 957, 961 (2d Cir. 1982). Second, the Supreme Court has expressly held that the Fifth Amendment's right to indictment by grand jury does not apply against the states. See Hurtado v. California, 110 U.S. 516, 538 (1884). (A topic for another day is that the institution of the grand jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors. It is not the worst thing in the world that the right was not incorporated.) Third, the Sixth Amendment's Vicinage Clause does not appear to have been incorporated, although neither the Supreme Court nor the Tenth Circuit has commented on the subject. See Caudill v. Scott, 857 F.2d 344, 346 (6th Cir. 1988); Cook v. Morrill, 783 F.2d 593, 595-96 (5th Cir. 1986); Zicarelli v. Dietz, 633 F.2d 312, 325-26 (3d Cir. 1980). Fourth, the Supreme Court has held that the Constitution imposes one condition on federal criminal juries that it does not impose on their state counterparts: that their verdicts be unanimous. See Williams v. Florida, 399 U.S. 78, 103 (1970). These unincorporated Sixth Amendment "rights" are unique, in that they have no basis in the Sixth Amendment's text; the Supreme Court read a penumbra onto the Amendment's use of "trial[] by . . . jury," which it applies against the federal government but not against the states. U.S. Const. amend. VI. Fifth, and probably the most important unincorporated right, the Seventh Amendment to the Constitution's right to a civil jury trial -- and its right against re-examination of a jury verdict, although that right has little meaning without a broader jury-trial right -- does not apply against the states. See Minneapolis & St. Louis R.R. Co. v. Bombolis, 241 U.S. 211, 218 (1916). Sixth and finally, "[t]here is a surprising amount of confusion as to whether the Excessive Fines Clause has been incorporated." Reyes v. N. Tex. Tollway Auth., 830 F. Supp. 2d 194, 206 (N.D. Tex. 2011)(Fish, J.).

In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989)("Browning-Ferris"), the Supreme Court held that the Excessive Fines Clause does not place limits on punitive damages in suits between private parties. 492 U.S. at 260. The Supreme Court did not address incorporation, but the Honorable Sandra Day O'Connor, then-Associate Justice of the Supreme Court, addressed the issue. The case involved a diversity suit and, while the majority saw no reason to delve into the incorporation issue -- the trial, after all, occurred in federal court -- Justice O'Connor apparently felt that, because Vermont state law had supplied the substantive law giving rise to the punitive damages, the incorporation issue was a threshold question. The majority declined to address the issue:

Because of the result we reach today, we need not answer several questions that otherwise might be necessarily antecedent . . . . We shall not decide whether the

_____

> Eighth Amendment's prohibition on excessive fines applies to the several States through the Fourteenth Amendment, nor shall we decide whether the Eighth Amendment protects corporations as well as individuals.

Browning-Ferris, 492 U.S. at 276 n.22.  Justice O'Connor did not perform much analysis, but she made her position on the issue clear:

> Since Robinson, the Cruel and Unusual Punishments Clause has been regularly applied to the States, most notably in the capital sentencing context.  In addition, the Court has assumed that the Excessive Bail Clause of the Eighth Amendment applies to the States.  I see no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation, and would hold that the Excessive Fines Clause also applies to the States.

Browning-Ferris, 492 U.S. at 284 (O'Connor, J., concurring in part and dissenting in part, joined by Stevens, J.)(citation omitted).  Before Browning-Ferris, apparently no court -- either federal or state -- had addressed whether the Excessive Fines Clause is incorporated.  This gap in the case law can perhaps be explained by the fact that -- much like the Seventh Amendment's right to a civil jury trial -- almost every state has an equivalent to the Clause in its state constitution. See Browning-Ferris, 492 U.S. at 264 & n.5.

Over a span of about three years beginning roughly a decade after Browning-Ferris, the United States Courts of Appeals for the Fifth, Seventh, and Ninth Circuits each held that the Excessive Fines Clause is incorporated against the states.  See Watson v. Johnson Mobile Homes, 284 F.3d 568, 572 (5th Cir. 2002); Wright v. Riveland, 219 F.3d 905, 915-19 (9th Cir. 2000); Towers v. City of Chicago, 173 F.3d 619, 623-24 (7th Cir. 1999).  More importantly, around the same time, the Supreme Court issued a seemingly authoritative word on the matter.  In Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001)("Cooper"), the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court -- who had been the sole Justice to join Justice O'Connor's opinion in Browning-Ferris -- wrote for the majority that,

> [d]espite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion.  That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States.

Cooper, 532 U.S. at 433-34 (citation omitted).

Although this proclamation would seem to have closed discussion on the question of incorporation, the Supreme Court reopened it again in 2010.  In McDonald v. City of Chicago, the Supreme Court welcomed the Second Amendment's right to bear arms into the pantheon of incorporated rights (it remains its newest member).  The Honorable Samuel A. Alito, Jr., Associate Justice of the Supreme Court, writing for the majority, described the doctrine of selective incorporation in detail, noting:

_____

> In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.

> We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause. See Browning-Ferris, 492 U.S. at 276, n.22 (declining to decide whether the excessive-fines protection applies to the States).

McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13. The most recent word from the Supreme Court is, thus, that the right against excessive fines is "not fully incorporated," because the Supreme Court "never ha[s] decided whether" it is incorporated. 561 U.S. at 765 n.13. See 2 William J. Rich, MODERN CONSTITUTIONAL LAW § 26:3 n.14 (3d ed.)(Incorporation of the Bill of Rights)(listing the right against excessive fines as an unincorporated right); 1 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, CRIMINAL PROCEDURE § 2.6(b) (3d ed.) (Guarantees not yet incorporated)(listing the Excessive Fines Clause).

That the Supreme Court has not yet issued a case expressly incorporating the Excessive Fines Clause, however, does not mean that it is not incorporated. It seems to the Court that there are three rungs on the incorporation ladder: (i) rights that the Supreme Court has expressly incorporated; (ii) rights on which the Supreme Court has either remained silent or has stated that they "remain unincorporated," "have not yet been incorporated," or "are not incorporated"; and (iii) rights that the Supreme Court has expressly held do not apply against the states. Most rights in the Bill of Rights are now in the first category. The Third Amendment's protection against quartering soldiers, Sixth Amendment's Vicinage Clause, and the Eight Amendment's Excessive Fines Clause are the second category. The Fifth Amendment's grand-jury right, the Sixth Amendment's rights to a unanimous, twelve-person criminal jury, and the Seventh Amendment's civil jury right are in the third category.

The Supreme Court's placement of rights into the first and third categories constitutes legal holdings on issues of federal law, and thus bind all state and federal courts nationwide. The Court notes that, while the third category is binding as a matter of vertical stare decisis -- no federal court, nor technically any state court, may hold that, e.g., the federal constitutional grand-jury right applies to the states, because there is a Supreme Court case, Hurtado v. California, which expressly holds to the contrary -- the vitality of those cases, as a matter of horizontal stare decisis, is suspect. See McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13 ("Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation."). The second category, however, reflects the Supreme Court's decision not to pass on the incorporation question -- and subsequent acknowledgements of the decision not to pass on the question -- as a matter of constitutional avoidance. These decisions do not constitute "holdings" and thus do not bind either the state or federal courts. In fact, several federal appellate courts have held that rights in the second category are incorporated. See United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988)(Third Amendment); Engblom v. Carey, 677 F.2d at 961

(same); Caudill v. Scott, 857 F.2d at 346; Cook v. Morrill, 783 F.2d at 595-96 (Vicinage Clause); Zicarelli v. Dietz, 633 F.2d at 325-26 (same); Watson v. Johnson Mobile Homes, 284 F.3d at 572 (Excessive Fines Clause); Wright v. Riveland, 219 F.3d at 915-19 (same); Towers v. City of Chicago, 173 F.3d at 623-24 (same).

Two particularities of the incorporation context often obfuscate this seemingly mundane observation -- that the Supreme Court's avoidance of a question is not binding as a negative answer to that question. First, only the Supreme Court -- and not the Courts of Appeals -- can bind state courts, even on matters of federal law (no federal court, including the Supreme Court, can bind state courts on matters of state law). See Steffel v. Thompson, 415 U.S. 452, 482 n.3 (1974)(Rehnquist, J., joined by Burger, C.J., concurring); Perez v. Ledesma, 401 U.S. 82, 125 (1971)(Brennan, J., joined by White & Marshall, JJ., dissenting)(referring to "the persuasive force" of a decision of a lower federal court on state courts); Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 HARV. L. REV. 1130, 1231 n.495 (1986); David L. Shapiro, State Courts and Federal Declaratory Judgments, 74 NW. U. L. REV. 759, 771 (1979). At least some state courts consider themselves bound by federal lower-court interpretations of federal law; it is not clear whether they view federal district court opinions, or only intermediate-appellate decisions, as binding. See Handy v. Goodyear Tire & Rubber Co., 160 So. 530 (Ala. 1935)(holding that the federal appellate courts' "decision[s] involv[ing] construction and application of [a] federal statute . . . [are] binding on state courts"). The Supreme Court of Utah expressed a similar opinion:

> If, therefore, there is a decision from a federal court which is decisive of the question here, and especially if the federal decision is one that is more recent than the one cited from a state court, it is our duty to follow the federal court rather than the state court, since the question involved is one upon which the federal courts have the ultimate right to speak.

Kuchenmeister v. Los Angeles & S.L.R., 172 P. 725, 727 (Utah 1918). This rule -- that only the Supreme Court can bind the states -- is always true -- its application is not limited to decisions about incorporation, but its impact in the incorporation context virtually nullifies any decision that the lower federal courts might make whether a right is incorporated. Because the only effect of a holding that a right is incorporated is that the right applies against the state -- the holding says nothing about the right's substance or scope -- and because the state courts are free to ignore lower federal court holdings on the issue, the only binding effect that such a holding has is the potential creation of a federal court-only civil cause of action against the state; the rights that the lower federal courts incorporate cannot even give rise to federal habeas relief. See Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("[A] writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication . . . was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . ." (emphasis added)).

To some extent, this situation always exists between the lower federal courts and the state courts; for example, if the Supreme Court of New Mexico interpreted the Supreme Court's First Amendment precedent as not protecting expressive activity X, and the Tenth Circuit interpreted the First Amendment to protect X, then citizens that New Mexico punished for partaking in X would be limited to the federal courts in seeking recourse. That example, however, follows the

- 16 -

pattern that the Court already laid out as being the only effective result of a lower federal court incorporation holding: case-by-case resolution of individual claims in the federal courts. The more systemic impacts that judicial opinions often have -- the ones that have an effect on individuals beyond those who come directly before the courts, such as striking down statutes and invalidating programs -- would seem to be off the table as it relates to rights that only the lower federal courts have incorporated. For example, the Second Circuit held that the Third Amendment's protection against quartering soldiers is incorporated against the states. See Engblom v. Carey, 677 F.2d at 961. While that holding may seem to entail that the Third Amendment prohibits the states of Connecticut, New York, and Vermont from quartering soldiers in private residences, any of those states' legislatures could adopt a soldier-quartering program, and the state's supreme court could, without flouting the law, uphold it. This example is designed for a specific purpose; in all likelihood such a program would violate the federal Fourth Amendment, and several other federal and state laws. The program's victims could, on a case-by-case basis, file for individual relief in federal court, and the federal courts could grant the relief, but the state courts would be under no obligation to align their rulings with the federal courts' until the Supreme Court speaks on the issue. It is not entirely clear whether, under such circumstances, a federal judgment purporting to strike down the program would be valid. See Yniguez v. Mofford, 939 F.2d 727, 730 n.1, 735-37 & nn.7-11 (9th Cir. 1991)(Reinhardt, J.). Lower federal court holdings regarding incorporation are thus different from other lower federal court interpretations of federal law: the applicability of most federal law -- i.e., the United States Code -- to the states is not in dispute, even if its precise scope and meaning is, see U.S. Const. art. VI, cl. 2 (Supremacy Clause); the only other context in which the potential for such a standoff between the lower federal courts and the state courts exists is with federal preemption doctrine.

The second peculiarity that causes incorporation doctrine to be decided almost exclusively at Supreme Court-level is that, although they can, state courts have little incentive to hold that a federal constitutional right is incorporated if the Supreme Court has left the question open. The Bill of Rights is a floor, not a ceiling, and state courts can interpret their own constitutions -- which often contain provisions closely mirroring the federal Bill of Rights -- or statutes to provide for the right in question. See Pena v. Greffet, No. CIV 12-0710 JB/KBM, 2015 WL 3860084, at *25 (D.N.M. June 17, 2015)(Browning, J.)(citing State v. Cardenas-Alvarez, 2001-NMSC-017, ¶¶ 32–35, 25 P.3d 225, 237-40)(discussing the New Mexico state courts' embrace of "New Federalism," a doctrine of state-level expansion on federal constitutional rights, which the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, championed). By voluntarily holding that an as-yet unincorporated federal constitutional provision binds them, they risk (i) that the Supreme Court will overrule them and hold that the provision is not incorporated -- possibly even resulting in an unfixable reversal in the case in which the state supreme court applied the right, if the state supreme court did not go out of its way to additionally base its decision on an adequate and independent state ground, see Michigan v. Long, 463 U.S. 1032 (1983); or (ii) that the Supreme Court will, in subsequent decision, go on to define the contours of the right in a way that the state supreme court does not like.

For its part, the Court concludes that the Excessive Fines Clause is incorporated against the states. The Court does not fully subscribe to Justice O'Connor's reasoning that there is "no reason to distinguish one Clause of the Eighth Amendment from another for the purposes of

incorporation." Browning-Ferris, 492 U.S. at 287.  Whatever the merits of Justice O'Connor's stance may be, the Supreme Court parses amendments down into their constituent clauses and rights for incorporation purposes -- sometimes incorporating some, but not all, of an amendment. Compare Hurtado v. California, 110 U.S. at 538 (holding that states need not honor the Fifth Amendment grand-jury right); with Griffin v. California, 380 U.S. at 615 (incorporating the Fifth Amendment right against self-incrimination against the states); Benton v. Maryland, 395 U.S. at 796 (incorporating the Fifth Amendment probation on successive prosecutions); and Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. at 258 (incorporating the Fifth Amendment right against deprivation of property without just compensation).  To the Court, however, the nature of a criminal fine is that each of its properties -- its purpose, the severity of its incursion on liberty, and the legal process attendant to its imposition -- overlap with at least one of the following: (i) punitive damages; (ii) criminal imprisonment; and (iii) bail.  Each of those three incursions on personal liberty is subject to federal constitutional constraints, even when a state imposes them.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75 (1996) (holding that punitive damages that a state court imposed pursuant to state law violated the federal Due Process Clause); Kennedy v. Louisiana, 554 U.S. 407, 419 (2008)(holding that the federal Cruel and Unusual Punishments Clause imposes on state court proceedings a proportionality requirement between the severity of a crime and the magnitude of its sentence); Schilb v. Kuebel, 404 U.S. at 365 (incorporating the Excessive Bail clause against the states). The Court will compare criminal fines with each of these other penalties and describe how their similarities support incorporation of the Excessive Fines Clause.

Punitive damages involve the same liberty incursion -- deprivation of money -- for much the same purpose -- to punish -- and are imposed subject to a similar process -- a trial on the merits.  The case for applying constitutional strictures to criminal fines is, in most ways, stronger than the case for applying them to civil fines: a government has a greater incentive to abuse monetary impositions when it is the direct recipient of the money than when it is refereeing a dispute between private third parties.  Cf. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").  The recent unrest in Ferguson, Missouri, provides a good example of the hazards of vesting governments with the unchecked authority to fine:

> The City budgets for sizeable increases in municipal fines and fees each year, exhorts police and court staff to deliver those revenue increases, and closely monitors whether those increases are achieved. . . .
>
> . . . .
>
> Ferguson has allowed its focus on revenue generation to fundamentally compromise the role of Ferguson's municipal court.  The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests. . . .
>
> . . . .

To handle the increasing caseload, the City Manager also requested and secured City Council approval to fund additional court positions, noting in January 2013 that "each month we are setting new all-time records in fines and forfeitures," that this was overburdening court staff, and that the funding for the additional positions "will be more than covered by the increase in revenues."

. . . .

[F]or fiscal year 2015, the City's budget anticipates fine and fee revenues to account for $3.09 million of a projected $13.26 million in general fund revenues.

. . . .

Even more recently, the City's Finance Director stated publicly that Ferguson intends to make up a 2014 revenue shortfall in 2015 through municipal code enforcement, stating to Bloomberg News that "[t]here's about a million-dollar increase in public-safety fines to make up the difference." . . .

United States Department of Justice Civil Rights Division, Investigation of the Ferguson Police Department, 2, 3, 9, 10, 13 (March 4, 2015)(footnotes omitted). Originally intended primarily to investigate the shooting death of an African-American teenager at the hands of a Ferguson police officer, the DOJ's investigation ultimately produced a 105-page final report devoted primarily to the city's allegedly exploitative and excessive fine-administration and -collection system.

The constitutional procedural protections attendant to criminal proceedings, namely the beyond-a-reasonable-doubt standard and the right to assistance of counsel -- which existence (and incorporation) might seem to obviate the need for the additional incorporation of a protection against excessive criminal fines -- do not typically apply unless the crime or violation also carries the potential for a prison sentence, in addition to a fine. See Blanton v. City of N. Las Vegas, 489 U.S. 538 (1989)(holding that the Sixth Amendment does not guarantee a jury trial on petty offenses, which presumptively includes all crimes whose maximum sentence of incarceration is below six months, but leaving room for the possibility that "additional penalties [such as monetary fines] . . . [may be] so severe [as to indicate] that the legislature clearly determined that the offense is a serious one" meriting a jury trial); Scott v. Illinois, 440 U.S. 367 (1979)(holding that there is presumptively no right to assistance of counsel when the defendant does not face the possibility of incarceration). Even when the threshold finding of criminal guilt is predicated on a jury verdict (or waiver thereof) by proof beyond a reasonable doubt, a judge -- by way of a combination of preponderance-of-the-evidence factfinding and judicial discretion -- typically decides both the binary determination whether to impose a find and the incremental determination of its amount.

The similarities between fines, and cruel and unusual punishment, also cut in favor of incorporation. Criminal fines exist to effectuate the same goals as the "punishments" to which the Cruel and Unusual Punishments Clause refers: deterrence -- both specific and general; incapacitation; rehabilitation; and punishment. See 18 U.S.C. § 3553(a) (titled "Factors to be considered in imposing a sentence"); id. § 3572(a) (directing district courts to consider "the factors set forth in section 3553(a)" in "determining whether to impose a fine, and the amount").

- 19 -

U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").  At the hierarchy's middle tier -- mandatory for the district court, but subject to the Excessive Fines Clause's constraints -- are three United States Code sections: the general sentencing statute, 18 U.S.C. § 3553(a), and the fines-specific

See also United States v. Courtney, No. CR 11-2860 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.)(outlining the differences between specific and general deterrence).  It is important to note that fines, unlike restitution and costs of prosecution -- and unlike non-punitive damages, for that matter -- lack any compensatory purpose.  Fines and incarceration are typically imposed via the same basic procedural mechanisms: a beyond-a-reasonable-doubt trial (or waiver thereof) at the liability phase, followed by preponderance-of-the-evidence judicial factfinding and discretion at the penalty phase.  Moreover, there is a key overlap in the analytical standards of both the Cruel and Unusual Punishments Clause, and the Excessive Fines Clause: both require a loose proportionality between the crime committed and the penalty imposed.  See Kennedy v. Louisiana, 554 U.S. at 419 ("[T]he Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.'" (citing Weems v. United States, 217 U.S. 349, 367 (1910))(alterations in Kennedy v. Louisiana but not in Weems v. United States)); United States v. Bajakajian, 524 U.S. 321, 334 (1998)("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality."  (citing Austin v. United States, 509 U.S. 602, 622-23 (1993))).  Of course, the nature of the penalties with which the Cruel and Unusual Punishments Clause deals -- incarceration and the death penalty -- are more serious than those with which the Excessive Fines Clause deals, and that fact cuts against incorporation of the latter Clause against the states, but the similarities between the two Clauses are still great enough to be instructive.

Last, criminal fines share some features with bail.  Both are monetary impositions associated with a criminal case.  Bail has the fewest procedural safeguards associated with it of any of the penalties discussed -- bail is imposed while the defendant is presumed innocent, with relatively minimal process -- and thus the justifications for incorporating the Excessive Bail Clause's substantive constraints on the magnitude of the bail are strong.  Still, one's failure to pay a designated fine, like one's failure to pay an assigned bail amount, often results in jail.  In the bail context, the Constitution deals with this potentially hazardous opportunity for governmental abuse by imposing substantive limitations on bail -- i.e., limiting its amount -- rather than procedural ones, such as requiring a certain burden of proof or factfinding process.  While there are procedural protections built into the federal bail-setting process, they are statutory, not constitutional, and apply only to the federal courts.  See 18 U.S.C. §§ 3141-3150.  The Supreme Court has incorporated the Excessive Bail Clause's substantive safeguards against the states.  See Schilb v. Kuebel, 404 U.S. at 365.  If the Supreme Court deemed it to be "implicit in the concept of ordered liberty" to have substantive safeguards against one form of "excessive" imprisonment-threatening monetary imposition, then it probably follows that the Constitution's analogous constraints on the other form mentioned in the same amendment should, likewise, be incorporated.

sentencing statute, 18 U.S.C. § 3572(a), both of which bow to the substantive criminal statute

under which the defendant is convicted, which obviously varies depending on the case.  At the

third and lowest level -- nonbinding on the district court[2] -- are two Guidelines provisions: the

---

[2]Attorneys and courts often say that "the Guidelines are . . . advisory," but it appears more appropriate to say that the Guidelines ranges are advisory.  Gall v. United States, 552 U.S. 38, 46 (2007)("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline range, see id. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated guideline range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2–3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in

general fines guideline, U.S.S.G. § 5E1.2, and the guideline for the substantive offense, which overrides it.  As is typical of such hierarchies, the successively lower tiers of authority provide more specific and detailed guidance about what the district court should do, and -- while it should not be assumed -- compliance with the lower-tier authority is likely to produce compliance with the higher-tier authority.  See Kimbrough v. United States, 552 U.S. 85, 89 (2007)(stating that, in the ordinary case, the Guidelines "sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives'" (quoting Rita v. United States, 551 U.S. 338, 350 (2007))); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006) ("[A] sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness."); United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007) ("[I]t was error for the district court to apply the appellate presumption of reasonableness to the advisory guidelines when sentencing."   (citing Rita v. United States, 551 U.S. 338)). Accordingly, district courts should start with the Guidelines and then move to the statute in selecting an appropriate fine, and only then analyze whether the selected fine violates the Excessive Fines Clause.  Cf. U.S.S.G. § 1B1.1; United States v. Nolf, 30 F. Supp. 3d 1200,

---

variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."   Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.   See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"  (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d at 1222-24 (emphasis in original).

1222-42 (D.N.M. 2014)(Browning, J.)(concluding that district courts must follow a certain sequence during sentencing, first calculating the Guidelines range and then looking to statutory considerations).   The Court will describe, in order, the steps involved in imposing a criminal fine.

### 1.      The Court Must First Calculate the Guidelines Range.

The Guidelines direct that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," although the Guidelines' overall advisory status post-United States v. Booker, as a practical matter, undoes the text's mandatory language.  U.S.S.G. § 5E1.2(a).  The Guidelines set forth a four-step process for imposing fines.

### a.      Step One: Assess the Defendant's Ability to Pay.

Anyone can serve a prison sentence, but not everyone can pay a fine.   The fine guideline's exception for "defendant[s who] establish[] that [they are] unable to pay and [are] not likely to become able to pay any fine" trumps, as a practical matter, everything else in the determining whether to impose a fine.  U.S.S.G. § 5E1.2(a).

> The determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay a fine. The inability of a defendant to post bail bond (having otherwise been determined eligible for release) and the fact that a defendant is represented by (or was determined eligible for) assigned counsel are significant indicators of present inability to pay any fine.  In conjunction with other factors, they may also indicate that the defendant is not likely to become able to pay any fine.

U.S.S.G. § 5E1.2 cmt. 3.  If the defendant is unable to pay a fine, the district court should impose other forms of punishment in lieu of the appropriate fine; the district court should not simply waive the fine.   See U.S.S.G. § 5E1.2(e).   Community service is the preferred alternative punishment when fines are unavailable.   See U.S.S.G. § 5E1.2(e).

This assessment starts with the defendant's literal ability to pay -- i.e., the figure that the defendant could pay if the defendant both liquidated all of his or her assets, and devoted all the future discretionary income that he or she is likely to earn to paying the fine -- but the district court may[3] cap this figure at the point at which the defendant actually paying it "would unduly burden the defendant's dependents" or other third parties.  U.S.S.G. § 5E1.2(e).  The Guidelines give no further guidance on how to determine a defendant's ability to pay, but, at this stage, the district court's focus should be on ascertaining the maximum fine available to be imposed -- including whether the defendant can pay any fine -- rather than on balancing the defendant's resources and the fine's effect on third parties against the need for the fine.  The district court can conduct that balancing after determining the Guidelines range for the fine, at the statutory-factors stage.

### b.       Step Two: Check for Overrides.

The second step is a check for overrides.  First, the district court should check the guideline for the substantive offense, and, "[i]f . . . the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence over" the generic fine guideline.  U.S.S.G. § 5E1.2(b).  Second, the district court should also check the statute of conviction, and, if the statute authorizes either a maximum fine greater than $250,000.00 or a daily compounding fine, then the district court -- which must still go through the other steps of

---

[3]The Guidelines say "may," and not "must" or "shall."  U.S.S.G. § 5E1.2(e).  The Guidelines do not specify to what factors the district court should look in deciding whether and to what extent to reduce a fine on the basis of the hardships it would cause to third parties.  The Court, however, concludes that three primary factors should be: (i) the number of third parties affected and magnitude of their hardship; (ii) their degree of culpability in the defendant's criminal conduct -- meaning their own probable innocence and their lack of knowledge of the conduct; and (iii) the extent to which the third parties function as a support system for the defendant and the likelihood that their avoiding the financial hardships of a fine will translate into reduced odds of recidivism for the defendant.

the Guidelines fine calculation -- should replace the Guidelines range's maximum fine with the statutory maximum fine.  See U.S.S.G. § 5E1.2(c)(2), (4).

### c.      Step Three: Calculate the Offense Level.

The third step is the same one that applies when determining the proper sentence of imprisonment to impose; this calculation need only be done once, and if the Court has already calculated the defendant's offense level for incarceration purposes, the offense level is the same for fine purposes.   In determining a defendant's offense level, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. 1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3 provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)      (A)      all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

        (B)      in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts

and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

**(2)**    solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

**(3)**    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

**(4)**    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.), aff'd 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)[4]("The district court's determination of 'relevant conduct' is a

---

[4]United States v. Schmidt is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009) and United

factual finding subject to a preponderance of the evidence standard, and clear error review.").
The evidence and information upon which the court relies, however, must have sufficient indicia
of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to
the sentencing determination, the court may consider relevant information without regard to its
admissibility under the rules of evidence applicable at trial, provided that the information has
sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v.
United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v.
United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a
double jeopardy challenge.  The defendant in Witte v. United States had been involved in an
unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and a 1991
attempt to import marijuana.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury
indicted the defendant for attempting to possess marijuana with intent to distribute in association
with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing,
the district court concluded that, because the 1990 attempt was part of the continuing conspiracy,
it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base
offense level based on the aggregate amount of drugs involved in both the 1990 and 1991
episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and
attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93.
The defendant moved to dismiss the indictment, arguing that he had already been punished for

States v. Banda, 168 F. App'x 284 (10th Cir. 2006) have persuasive value with respect to
material issues and will assist the Court in its disposition of this Memorandum Opinion and
Order.

the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed with the defendant and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments that the Fifth Amendment's Double Jeopardy Clause protects.  See 515 U.S. at 395.  The Fifth Circuit reversed the district court's ruling and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and that "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive

a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." 515 U.S. at 403.

In <u>United States v. Watts</u>, the Supreme Court, in a per curiam opinion, relied upon <u>Witte v. United States</u>' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. <u>See</u> 519 U.S. at 154. In reaching this result, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence. <u>See</u> 519 U.S. at 149 (citing, <u>e.g.</u>, <u>United States v. Coleman</u>, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis in <u>United States v. Watts</u> with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. <u>See</u> <u>United States v. Watts</u>, 519 U.S. at 151. According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." <u>United States v. Watts</u>, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in <u>Witte v. United States</u> and <u>United States v. Watts</u>. <u>See</u> <u>United States v. Andrews</u>, 447 F.3d 806, 810 (10th Cir. 2006)(applying <u>Witte v. United States</u>' holding to affirm that a career-offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment). In <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's

argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The

Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).[5]

---

[5]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since described its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704

### d.    Step Four: Determine the Guidelines Range.

Once the district court has calculated the offense level, it can determine the Guidelines fine range. Unlike with imprisonment, the defendant's criminal history has no impact on his or her Guidelines fine range. Also unlike with imprisonment, the Guidelines establish different fine ranges only for different bands of offense levels, and not for each successive offense level. The following table shows the Guidelines fine ranges for various offense-level bands:

| Offense Level | Minimum Fine | Maximum Fine |
| --- | --- | --- |
| ≤ 3 | $100.00 | $5,000.00 (or statutory maximum, if applicable) |
| 4-5 | $250.00 | $5,000.00 (or statutory maximum, if applicable) |
| 6-7 | $500.00 | $5,000.00 (or statutory maximum, if applicable) |
| 8-9 | $1,000.00 | $10,000.00 (or statutory maximum, if applicable) |
| 10-11 | $2,000.00 | $20,000.00 (or statutory maximum, if applicable) |
| 12-13 | $3,000.00 | $30,000.00 (or statutory maximum, if applicable) |
| 14-15 | $4,000.00 | $40,000.00 (or statutory maximum, if applicable) |

---

F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)). See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level by 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

| 16-17 | $5,000.00 | $50,000.00 (or statutory maximum, if applicable) |
|---|---|---|
| 18-19 | $6,000.00 | $60,000.00 (or statutory maximum, if applicable) |
| 20-22 | $7,500.00 | $75,000.00 (or statutory maximum, if applicable) |
| 23-25 | $10,000.00 | $100,000.00 (or statutory maximum, if applicable) |
| 26-28 | $12,500.00 | $125,000.00 (or statutory maximum, if applicable) |
| 29-31 | $15,000.00 | $150,000.00 (or statutory maximum, if applicable) |
| 32-34 | $17,500.00 | $175,000.00 (or statutory maximum, if applicable) |
| 35-37 | $20,000.00 | $200,000.00 (or statutory maximum, if applicable) |
| $\geq 38$ | $25,000.00 | $250,000.00 (or statutory maximum, if applicable) |

U.S.S.G. § 5E1.2(c)(3).

**2.      The Court Must Then Consult the Statutory Factors.**

In addition to any fine provisions that the substantive statute of conviction may contain, there are two statutes that always apply to the imposition of criminal fines.  Section 3553(a) governs sentencing generally -- incarceration, supervised release, probation, fines, and restitution -- while § 3572(a) covers fines, specifically.  If there were any question whether § 3553(a) still applies to fines despite the existence of a more specific statute, § 3572(a) puts them to rest, directing courts to consider the § 3572(a) factors "in addition to the factors set forth in section 3553(a)."  18 U.S.C. § 3572(a).

These two sections are on equal footing -- neither is subordinate to or subject to the other -- and each contains a list of factors for the district court to consider in imposing its sentence. The fourteen[6] pertinent factors are: (i) the offense's nature and circumstances, and the

------

[6]Section 3553(a) contains seven factors and § 3572(a) contains eight factors.  The Court has also omitted one of the § 3553(a)(2) subfactors, the need "to provide the defendant with

defendant's history and characteristics, see 18 U.S.C. § 3553(a)(1); (ii) the need for the sentence imposed to reflect the offense's seriousness, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, see 18 U.S.C. § 3553(a)(2); (iii) the Guidelines fine range, see 18 U.S.C. § 3553(a)(4); (iv) whether the defendant has previously been fined for a similar offense, whether the defendant faces collateral consequences, such as civil lawsuits, from his or her actions, and any other pertinent Guidelines policy statements, see 18 U.S.C. § 3553(a)(5); U.S.S.G. § 5E1.2(d)(5)-(6);[7] (v) the need to avoid unwarranted fine disparities among defendants with similar records who have been found guilty of similar conduct, see 18 U.S.C. § 3553(a)(6); (vi) the need to provide restitution to any victims of the offense, see 18 U.S.C. § 3553(a)(7); (vii) the defendant's income, earning capacity, and financial resources, see 18 U.S.C. § 3572(a)(1); (viii) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on

---

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," because it is inapplicable to fines. 18 U.S.C. § 3553(a)(4)(D).

[7]Section 3553(a)(5) directs district courts to consider "any pertinent policy statement" in the Guidelines. 18 U.S.C. § 3553(a)(5). The Guidelines contain their own list of 8 factors for the district court to consider when selecting where exactly, within the offense level-determined Guidelines range, to set the fine. See U.S.S.G. § 5E1.2(d). Of these 8 factors, however, only 2 -- "any collateral consequences of conviction, including civil obligations arising from the defendant's conduct," and "whether the defendant previously has been fined for a similar offense" -- are not already covered by the fine statute, § 3572(a). U.S.S.G. § 5E1.2(d)(5)-(6). Rather than summarize the Guidelines factors in full at the Guidelines-calculation stage and then largely repeating those same factors at the variance stage, the Court will incorporate the two non-statutory § 5E1.2(d) factors into the § 3553(a) factor that directs district courts to consider them. This treatment is appropriate, given that the § 5E1.2(d) factors, despite being in the Guidelines, do not go to determining the Guidelines range, which is determined based solely on offense level. See U.S.S.G. § 5E1.2(c).

the defendant, relative to the burden that alternative punishments would impose, see 18 U.S.C. § 3572(a)(2); (ix) any pecuniary loss inflicted upon others as a result of the offense, see 18 U.S.C. § 3572(a)(3); (x) whether restitution is ordered or made and the amount of such restitution, see 18 U.S.C. § 3572(a)(4); (xi) the need to deprive the defendant of illegally obtained gains from the offense, see 18 U.S.C. § 3572(a)(5); (xii) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence, see 18 U.S.C. § 3572(a)(6); (xiii) whether the defendant can pass on to consumers or other persons the expense of the fine, see 18 U.S.C. § 3572(a)(7); and (xiv) if the defendant is an organization, the size of the organization and any measures it has taken to discipline any officer, director, employee, or agent of the organization responsible for the offense or to prevent a recurrence of such an offense.   Some of these factors are categorically inapplicable to certain cases or defendants.   Factor (xiv), and usually factor (xiii), apply only to business-entity defendants.   See 18 U.S.C. § 3572(a)(6)-(7).   Factors (vi) and (x), which concern restitution, are inapplicable to cases that lack an identifiable victim.[8]   See 18 U.S.C. §§ 3553(a)(7), 3572(a)(4). In cases where restitution is involved, however, those factors are of paramount importance, as the district court's imposition of a fine must not impede the defendant's ability to pay restitution. See 18 U.S.C. § 3572(b) ("[T]he court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution.").

---

[8]District courts should still consider factor (ix), "any pecuniary loss inflicted upon others as a result of the offense," even when there is no identifiable victim.   18 U.S.C. § 3572(a)(3). Congress listed this factor separately from the restitution factor, and the court should seek to give that drafting decision content.   If the defendant's crime did not inflict any pecuniary loss on anyone -- and just because a crime lacks an identifiable victim does not mean that this is the case -- then this factor cuts in the defendant's favor.   See United States v. Valdez, No. CR 13-0559-2 JB, 2014 WL 7473803, at *28 n.16 (D.N.M. Dec. 15, 2014)(Browning, J.).

The district court must weigh these factors to determine where in the Guidelines range to fine the defendant or whether to vary from the Guidelines fine range. If the defendant can pay some, but not all, of an appropriate-level fine, or if imposition of an appropriate fine would cause some hardship to third parties, the district court may exercise its discretion and replace some of the fine with other punishment, preferably community service. See U.S.S.G. § 5E1.2(e). The district court may not, however, impose a fine alongside an alternative sentence -- effectively giving the defendant a choice of sanctions, or a fallback if he or she is unable to pay the fine -- but, rather, must impose a sum certain at the point of sentencing. See 18 U.S.C. § 3572(e) ("[T]he court may not impose an alternative sentence to be carried out if the fine is not paid."). That said, a district court may make timely payment of the fine, or installments thereof, a condition of probation or supervised release. See U.S.S.G. § 5E1.2(f).

As is the case generally with sentencing, district courts enjoy substantial discretion in deciding whether to impose a fine, determining the amount to impose, and fashioning terms of repayment. See Gall v. United States, 552 U.S. at 49 ("[An] abuse-of-discretion standard of review applies to appellate review of all sentencing decisions -- whether inside or outside the Guidelines range."). The Courts of Appeals review these decisions deferentially, reversing only for unreasonableness, which can be procedural or substantive. "A sentence is procedurally unreasonable if the district court failed to calculate (or improperly calculated) the Guidelines range, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors or failed to adequately explain the chosen sentence." United States v. Middagh, 594 F.3d 1291, 1294 (10th Cir. 2010)(internal quotation marks omitted). See United States v. Burgess, 576 F.3d 1078, 1101 (10th Cir. 2009)(internal quotation marks omitted). "A sentence is substantively unreasonable if, considering the factors set forth in 18 U.S.C. § 3553(a), the sentence is unreasonable in length."

United States v. Ellis, 525 F.3d 960, 964 (10th Cir. 2008).  The Tenth Circuit affords sentences within the properly calculated Guidelines range with a rebuttable presumption of reasonableness, see United States v. Kristl, 437 F.3d at 1054, but that presumption is strictly for the appellate courts; district courts must fashion a sentence that incorporates all of the statutory factors, including the Guidelines range, see 18 U.S.C. § 3553(a)(4)(A) (directing courts to consider "the sentencing range . . . set forth in the guidelines"), but not limited to it or reliant on it to properly reflect the other factors, see United States v. Conlan, 500 F.3d at 1169 (holding that it is "error for the district court to apply the appellate presumption of reasonableness to the advisory guidelines when sentencing" (citing Rita v. United States, 551 U.S. 338 (2007))).

**3.      The Fine Must Not Be Constitutionally Excessive.**

There are two inquiries associated with a constitutional excessive-fine analysis.  First, the appellate court will inquire whether and how much of the fine is "punitive" rather than "remedial."   United States v. Bajakajian, 524 U.S. 321, 331-32 (1998)("Bajakajian").   Only punitive fines -- or the punitive portions of part-remedial, part-punitive fines -- are subject to the Excessive Fines Clause; to the extent that part of the fine has a valid remedial justification, the courts will subtract that portion of the fine and analyze the punitive portion as if it was the only monetary sanction imposed.  Bajakajian, 524 U.S. at 331-32 & n.6; Austin v. United States, 509 U.S. 602, 621-22 (1993)("[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term."  (quoting United States v. Halper, 490 U.S. 435, 448 (1989))(emphasis and alteration in Austin v. United States but not in United States v. Halper)).

### a.        **Remedial Versus Punitive Monetary Sanctions.**

Whether and to what extent a fine is "remedial" depends upon the facts of the case and not on the legal label assigned to the monetary sanction.  Although labels can be instructive, because they tend to correlate to certain purposes -- "restitution" is almost always remedial, "civil in rem forfeitures" are typically remedial, and "fines" are typically punitive -- courts cannot rely on these labels and must make their own determinations about the nature of the sanction.  See Austin v. United States, 509 U.S. 602, 618 (1993).  To be clear, in the same way that a general assessment on a populace can be a tax for constitutional purposes and a non-tax for statutory purposes, see Nat'l Federation of Indep. Business v. Sebelius, 132 S. Ct. 2566, 2594 (2012)("[T]he Act describes the payment as a 'penalty,' not a 'tax.'  But while that label is fatal to the application of the Anti-Injunction Act, it does not determine whether the payment may be viewed as an exercise of Congress's taxing power."  (citation omitted)), a government-imposed[9] monetary sanction, however labeled, is a "fine" under the Excessive Fines Clause only to the extent that it is punitive, see Bajakajian, 524 U.S. at 331-32 & n.6.  Statutory civil forfeitures, special assessments, and, even, theoretically, restitution could all be constitutional fines, while statutory fines could, likewise, fall outside of the Clause's scope.  See supra note 9.

It is not entirely clear what the term "remedial" means in the excessive-fines context. The Supreme Court appears, however, to have given the term a much narrower definition than it

---

[9]The "Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 260 (1989)(holding that the Clause "limit[s] only those fines directly imposed by, and payable to, the government").  Interestingly, the Clause can apply to restitution -- which, obviously, like punitive damages and unlike most fines, ultimately goes to a private party and not to the government.  See Paroline v. United States, 134 S. Ct. 1710, 1726 (2014)("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes.  That may be 'sufficient to bring [it] within the purview of the Excessive Fines Clause.'"  (citations omitted)).

has in everyday use.  Two cases, both at the Supreme Court level, speak to this issue; in <u>Austin</u>

<u>v. United States</u>, the Supreme Court wrote:

> We turn next to consider whether forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7) are properly considered punishment today.  We find nothing in these provisions or their legislative history to contradict the historical understanding of forfeiture as punishment.  Unlike traditional forfeiture statutes, §§ 881(a)(4) and (a)(7) expressly provide an "innocent owner" defense.  These exemptions serve to focus the provisions on the culpability of the owner in a way that makes them look more like punishment, not less.  In <u>United States v. United States Coin & Currency</u>, 401 U.S. 715 (1971), we reasoned that 19 U.S.C. § 1618, which provides that the Secretary of the Treasury is to return the property of those who do not intend to violate the law, demonstrated Congress' intent "to impose a penalty only upon those who are significantly involved in a criminal enterprise."  The inclusion of innocent-owner defenses in §§ 881(a)(4) and (a)(7) reveals a similar congressional intent to punish only those involved in drug trafficking.
>
> Furthermore, Congress has chosen to tie forfeiture directly to the commission of drug offenses.  Thus, under § 881(a)(4), a conveyance is forfeitable if it is used or intended for use to facilitate the transportation of controlled substances, their raw materials, or the equipment used to manufacture or distribute them.  Under § 881(a)(7), real property is forfeitable if it is used or intended for use to facilitate the commission of a drug-related crime punishable by more than one year's imprisonment.
>
> The legislative history of § 881 confirms the punitive nature of these provisions.  When it added subsection (a)(7) to § 881 in 1984, Congress recognized "that the traditional criminal sanctions of fine and imprisonment are inadequate to deter or punish the enormously profitable trade in dangerous drugs."  It characterized the forfeiture of real property as "a powerful deterrent."
>
> The Government argues that §§ 881(a)(4) and (a)(7) are not punitive but, rather, should be considered remedial in two respects.  First, they remove the "instruments" of the drug trade "thereby protecting the community from the threat of continued drug dealing."  Second, the forfeited assets serve to compensate the Government for the expense of law enforcement activity and for its expenditure on societal problems such as urban blight, drug addiction, and other health concerns resulting from the drug trade.
>
> In our view, neither argument withstands scrutiny.  Concededly, we have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society.  The Court, however, previously has rejected the government's attempt to extend that reasoning to conveyances used to transport illegal liquor.  In that case it noted: "There is nothing even remotely criminal in possessing an automobile."  The

same, without question, is true of the properties involved here, and the Government's attempt to characterize these properties as "instruments" of the drug trade must meet the same fate as Pennsylvania's effort to characterize the 1958 Plymouth sedan as "contraband."

The Government's second argument about the remedial nature of this forfeiture is no more persuasive. We previously have upheld the forfeiture of goods involved in customs violations as "a reasonable form of liquidated damages." But the dramatic variations in the value of conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7) undercut any similar argument with respect to those provisions. The Court made this very point in Ward: The "forfeiture of property . . . [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law."

509 U.S. at 619-22 (citations omitted). This passage suggests a reading of "remedial" so circumscribed as to strain its plain meaning, which is that a monetary sanction is not remedial if it is based on a finding that the defendant did something wrong.

The Supreme Court's next case, Bajakajian -- which has become the seminal case construing the Excessive Fines Clause -- did nothing to backtrack from Austin v. United States, and may have even narrowed the concept of remedial-ness further. Bajakajian involved a defendant's conviction for taking $357,144.00 out of the country without authorization -- which is apparently required for amounts of more than $10,000.00. See Bajakajian, 524 U.S. at 324. Upon the defendant's conviction, the United States sought to keep the whole $357,144.00, which the Supreme Court ruled would violate the Excessive Fines Clause:

The Government specifically contends that the forfeiture of respondent's currency is constitutional because it involves an "instrumentality" of respondent's crime. According to the Government, the unreported cash is an instrumentality because it "does not merely facilitate a violation of law," but is "'the very sine qua non of the crime.'" The Government reasons that "there would be no violation at all without the exportation (or attempted exportation) of the cash."

Acceptance of the Government's argument would require us to expand the traditional understanding of instrumentality forfeitures. This we decline to do. Instrumentalities historically have been treated as a form of "guilty property" that can be forfeited in civil in rem proceedings. In this case, however, the Government has sought to punish respondent by proceeding against him

- 40 -

> criminally, in personam, rather than proceeding in rem against the currency. It is therefore irrelevant whether respondent's currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination.

Bajakajian, 524 U.S. at 333 (citations omitted). The Supreme Court also noted that, while the

instrumentality theory retains its vitality -- although apparently only in in rem proceedings[10] --

the money that the defendant was attempting to smuggle out of the country was not an

instrumentality of his crime:

> Although the term "instrumentality" is of recent vintage, it fairly characterizes property that historically was subject to forfeiture because it was the actual means by which an offense was committed. "Instrumentality" forfeitures have historically been limited to the property actually used to commit an offense and no more. A forfeiture that reaches beyond this strict historical limitation is ipso facto punitive and therefore subject to review under the Excessive Fines Clause.
>
> . . . .
>
> The currency in question is not an instrumentality in any event. The Court of Appeals reasoned that the existence of the currency as a "precondition" to the reporting requirement did not make it an "instrumentality" of the offense. We agree; the currency is merely the subject of the crime of failure to report. Cash in a suitcase does not facilitate the commission of that crime as, for example, an automobile facilitates the transportation of goods concealed to avoid taxes. In the latter instance, the property is the actual means by which the criminal act is committed. See Black's Law Dictionary 801 (6th ed. 1990)("Instrumentality" is "[s]omething by which an end is achieved; a means, medium, agency").

Bajakajian, 524 U.S. at 333 nn.8-9 (citations omitted). The Court interprets this final paragraph

narrowly. While $357,144.00 in cash may not be an instrumentality, because it is legal to

---

[10]Although both Austin v. United States and Bajakajian use the historical practice of in rem forfeitures of "guilty property" to illustrate when a sanction is remedial, the former case explicitly held that "forfeiture generally and statutory in rem forfeiture in particular historically have been understood, at least in part, as punishment." Austin v. United States, 509 U.S. at 618 (footnote omitted). Thus, although the block-quoted passage of Bajakajian, taken out of context, appears to imply that the procedural posture of the forfeiture suit -- in rem versus in personam -- is outcome dispositive whether the resultant forfeiture is a fine for Eighth Amendment purposes, that result is not the case.

possess, carry around, and use -- just not to take out of the country -- the Court concludes that a large quantity of, e.g., methamphetamines, would not be.  To conclude otherwise would lead to the absurd result that confiscation of large quantities of illegal drugs could -- if the drugs were valuable enough and especially if the defendant's culpability was relatively low, e.g., a mule -- violate the Excessive Fines Clause.

      **b.**      **The Requirement of Proportionality for Punitive Monetary Sanctions.**

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  Bajakajian, 524 U.S. at 334 (citing Austin v. United States, 509 U.S. at 622-23).  The proportionality inquiry is, as it sounds, a somewhat loose one.  It is also, rightly, deferential to both the district court's on-the-ground determinations and, more importantly, to Congress' decisions about what crimes should receive what penalties. "[I]f the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional."[11]  United States v. 817 N.E. 29th Dr., 175 F.3d 1304, 1309 (11th Cir. 1999).

Beyond that deference to the legislature, the Supreme Court has outlined factors for the courts to consider when determining whether a fine is excessive, and the Tenth Circuit has supplemented those factors:

> [T]he [Supreme] Court examine[s] several factors.  One of the most important [i]s Congress's judgment about the appropriate punishment for the owner's offense. Maximum statutory fines provide guidance on the legislative view of the seriousness of the offense.  The fines set out in the sentencing guidelines,

---

[11]The whole point of the Excessive Fines Clause, of course, is that it limits -- rather than trusts -- the government's discretion to levy large fines.  This presumption of validity raises the question whether the Clause's primary purpose is to cabin (i) the legislatures' authority to set fines; or (ii) the trial courts' authority to impose them.

promulgated by the United States Sentencing Commission, are another way of "[t]ranslating the gravity of a crime into monetary terms." Additional factors for consideration of the gravity of the offense include the extent of the criminal activity, related illegal activities, and the harm caused to other parties.

. . . .

[W]e must supplement the factors discussed by the Supreme Court. As we explained in United States v. 829 Calle De Madero, 100 F.3d 734 (10th Cir. 1996), a case decided before Bajakajian, a proportionality analysis is "factually intensive," so that a catalog of factors is not "necessarily exclusive." Like Ms. Lees, the owner in 829 Calle De Madero challenged the constitutionality of a residential forfeiture under § 881(a)(7). We stated that

> [i]n evaluating proportionality, courts must compare the severity of the offense with which the property was involved, the harshness of the sanction imposed, and the culpability of the claimant. Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture. Against these factors, the severity of the offense must be evaluated, taking into account the extent of both the claimant's and the property's role in the offense, the nature and scope of the illegal operation at issue, the personal benefit reaped by the claimant, the value of any contraband involved in the offense, and the maximum sanction Congress has authorized for the offense.

Thus, in addition to the Bajakajian factors, we suggested other considerations: the general use of the forfeited property, any previously imposed federal sanctions, the benefit to the claimant, the value of seized contraband, and the property's connection with the offense. Bajakajian in no way undermines the relevance of these factors in a proportionality analysis for a forfeiture proceeding . . . .

United States v. Wagoner Cty. Real Estate, 278 F.3d 1091, 1100-01 (10th Cir. 2002)(footnote omitted)(citations omitted).

Both the Supreme Court and the Tenth Circuit left open a vitally important question: whether the defendant's financial condition is relevant to the Excessive Fines Clause proportionality analysis, i.e., whether a given dollar-value fine for a given offense will be analyzed the same whether the defendant is a billionaire or a pauper. The Supreme Court speaks only of "compar[ing] the amount of the forfeiture to the gravity of the defendant's offense,"

Bajakajian, 524 U.S. at 336-37 (emphasis added), and, while the Tenth Circuit refers to the "harshness of the sanction" -- which would seem to depend on the fine's effect on the specific defendant involved -- it defines the term, rather thoroughly, without reference to the defendant's wealth: "Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture," United States v. Wagoner Cty. Real Estate, 278 F.3d at 1101 (quoting United States v. 829 Calle De Madero, 829 F.3d at 738).

In fact, given the number of factors that United States v. Wagoner County Real Estate sets forth as relevant to the proportionality analysis, the omission of even the slightest reference to the defendant's financial state or the fine's impact on the specific defendant was almost certainly intentional. The Tenth Circuit repeatedly states that its factors are non-exclusive, and it certainly never comes out and explicitly states that the defendant's wealth is irrelevant, so this omission may be more about avoiding the question than suggesting a negative answer to it. The Supreme Court was clearer about basing its failure to engage this issue on avoidance. In a footnote -- which was more-or-less apropos of nothing written above the line -- placed toward the end of its Bajakajian opinion, the Supreme Court wrote: "Respondent does not argue that his wealth or income are relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood, and the District Court made no factual findings in this respect." 524 U.S. at 340 n.15 (citation omitted). Whether the Excessive Fines Clause considers the defendant's financial resources -- i.e., whether the fine's magnitude as a percentage of the defendant's assets matter, or just the absolute magnitude, and whether the financial state in

which payment of the fine will leave the defendant is relevant[12] -- remains an open question, although there is nothing, except perhaps common sense, to suggest that it does.[13]

_____

[12]There are, theoretically, three broad ways to define the "amount" or "harshness" of a fine.  The first is simply the fine's absolute magnitude, i.e., the number behind the dollar sign.  This definition does not take into account the defendant's resources at all.  The second is the fine's magnitude as a percentage of the defendant's overall wealth, liquid assets, income, or disposable income.  Although this definition is really several definitions -- as the fine can be based on wealth, income, or a subset of either -- they all relate to an "absolute proportion" of the defendant's resources, i.e., they all refer, in the end, to the number in front of the percentage sign.  The third way of defining the harshness or amount of a fine focuses on the real diminution in quality of life that the fine is likely to impose on the defendant.  A fine of a set percentage of income or wealth will not necessarily produce the same average diminution in quality of life across defendants of all levels of income or wealth.  A defendant making $1,000,000.00 per year could likely weather a 50-percent-of-total-income fine much more comfortably than a defendant making $20,000.00 per year, even though the two fines, as a fraction of income, are the same, and the millionaire's fine is much greater in terms of absolute magnitude.  This concept -- known in economic parlance as diminishing marginal utility -- underlies the United States' system of progressive income taxation.

[13]The defendant's financial condition is at least indirectly built into the constitutional excessive-fines analysis.  Both the federal fine statute and the fine guideline direct courts to consider the defendant's resources, see 18 U.S.C. § 3572(a)(1)-(2) (directing courts to consider "the defendant's income, earning capacity, and financial resources," and "the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose"); U.S.S.G. § 5E1.2(d)(2)-(3) (directing courts to consider "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources," and "the burden that the fine places on the defendant and his dependents relative to alternative punishments"), and imposition in keeping with the legislature's mandates is both necessary and sufficient for a fine to receive a "strong presumption" of constitutionality, United States v. 817 N.E. 29th Dr., 175 F.3d at 1309.

Concluding that the defendant's financial state is pertinent to the fine statute and compliant with the fine statute is part of the constitutional analysis, however, is not the same as determining that the defendant's financial state being directly built into the constitutional analysis, for two reasons.  First, statutory compliance goes only to the binary determination whether the fine is afforded a presumption of constitutionality; it is unclear whether failure to take defendant-specific hardships into account can render a presumptively valid fine unconstitutional, or whether such consideration is necessary or helpful to render a fine without a presumption of constitutionality nonetheless valid.  It is important to bear in mind that, while a statutorily proper fine is presumptively constitutional, there is no indication that a statutorily excessive fine is presumptively unconstitutional.  Second, the federal fine statute and fine

In contrast to the deferential abuse-of-discretion standard under which the Court of Appeals reviews fines for statutory reasonableness, whether a fine is constitutionally excessive is reviewed de novo.  See Bajakajian, 524 U.S. at 337 & n.10.  Although the nominal standard of review under the Excessive Fines Clause is high, the Clause's substance effectively builds deference into the review: despite being de novo, the Court of Appeals will reverse a district court's imposition of a fine only if the fine is "grossly disproportional to the gravity of [the] offense" and not if it is merely "too high."  Bajakajian, 524 U.S. at 339-40.  See id. at 336 ("[A]ny judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise[, which] counsel[s] against requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense, and we therefore adopt the standard of gross disproportionality.").

## ANALYSIS

The Court will impose a $53,423.55 fine.  The fine will be payable in thirty-six monthly installments of $1,484.00, beginning when Juanico begins supervised release.  This fine is well below the statutory maximum of $250,000.00 per count, see 18 U.S.C. § 3571(b), and within the Guidelines range of $7,500.00 to $75,000.00, see U.S.S.G. § 5E1.2(c)(3).  After considering the fourteen applicable factors, see supra Law Regarding the Imposition of Criminal Fines, Part 2 (The Court Must Then Consult the Statutory Factors), the Court concludes that it should impose a fine equivalent to the costs of Juanico's incarceration and supervised release.

---

guideline may not apply in all cases, for all time.  Congress can amend the federal statute or guideline at any time.  Also, the Excessive Fines Clause is likely incorporated against the states, see supra note 1, and state fine statutes need not mirror the federal statute's provision for defendant-specific inquiries.

I.      **THERE ARE GOOD REASONS FOR IMPOSING A FINE.**

      Juanico pled guilty to three separate counts of assault of an intimate partner by strangling or suffocation under 18 U.S.C. §§ 1153 and 113(a)(8), a new statute that the 2013 re-authorization of the Violence Against Women Act created.  Congress, by enacting this statute, made it clear that federal courts must take domestic violence generally -- and strangulation in particular -- very seriously.  Juanico's crimes involved repeated and severe assaults and a death threat, and took place in close proximity to his children.  See PSR ¶¶ 13-15, at 5-6.  The political branches have ordered the Court to punish and prevent this sort of dangerous crime.

      The Court has imposed a sentence of 18-months incarceration, which is slightly more than half of the low end of his Guidelines range of 33 to 41 months.  See Tr. at 33:3-6 (Court); id. at 31:15-23 (Court).  The Court based its relatively lenient sentence, in part, on the fine it has chosen to impose.  See Tr. at 31:15-23 (Court).  The fine will "promote those factors in 3553(a) as well or better than" a longer term of incarceration would.  Tr. at 36:14-19 (Court).  Juanico presents a unique picture as a defendant.  Unlike many defendants that appear before the Court on a violent crime, Juanico otherwise presents a proactive image.  He graduated from high school in the top sixteen percent of his class and was part of the ROTC program.  He has a commercial driver's license and is a welder.  He makes good money by New Mexico standards.

      Juanico has worked for most of his life, and amassed a mobile home and three vehicles.  See PSR ¶ 88, at 18.  Work is important to him.  Material possessions, it seems, have meaning to him.  Losing some of these possessions will promote respect for the law and deter him from similar behavior in future relationships.

      The Court is acutely aware of Juanico's family obligations.  Criminal activity often -- indeed, usually -- has sad consequences for family members, especially children.  This case is no

different.   In fact, because it involves domestic violence in the same house as the couple's children, the imperative is greater.

The Court must punish domestic violence severely, but in Juanico's case not all of that sentence must consist of incarceration.   The reality is that, if the Court does not fine him, it would send him to prison for a longer sentence.   If the Court sends him to prison for a longer sentence, he will have fewer opportunities to see his children.   If the Court fines him, it may be more difficult for him to pay child support, but he will be outside of prison and able to earn more money.   Given Juanico's unique circumstances -- education, skills, assets -- it makes more sense to squeeze him a little financially rather than impose more incarceration.   It appears that, upon his release, child support will cost him approximately $1,000.00 per month.   See PSR ¶ 87, at 18. In his last position, he made a salary of $3,986.67 per month, or $47,840.04 per year.   See PSR ¶ 77, at 16.   Given that he can sell some of his existing assets, he should be able to pay both the fine and the child support on that salary.   The reality is that, if the fine option was not available here, the Court would have sentenced him to more time in prison so that the sentence reflected the severity of the offense, promoted respect for the law, provided just punishment, offered adequate deterrence, both at a general and specific level, and protected the public.   That the Court chose a fine over more prison time worked here, because of Juanico's unique circumstances.

Perhaps most important in deciding whether a fine is appropriate, Juanico has also cost the United States, the USPO, and the Court a lot of time and energy, and has cost the taxpayers a lot of money.   His incarceration will cost the country at least $43,937.46 when all is said and done, and his supervised release will then soak up another $9,486.00.   See 18 U.S.C. § 3572(a)(6) (directing district courts to consider "the expected costs to the government of any

imprisonment, supervised release, or probation component of the sentence"); U.S.S.G. § 5E1.2(d)(7) (same); PSR ¶ 101, at 20 (listing the Administrative Office of the Courts' current estimates of costs of prosecution at $2,440.97 per month while the defendant is housed in a BOP facility and $263.50 per month while he or she is on supervised release). Juanico has sufficient assets to pay the fine immediately, given that he has a $56,931.00 mortgage on a mobile home worth $130,000.00 and several vehicles. See PSR ¶ 88, at 18. He no longer has physical custody of any of his children, so he has no dependents reliant on the mobile home. See PSR ¶ 61, at 14. This fine is not unreasonable, nor is it excessive.

## II. JUANICO DID NOT PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT HE IS UNABLE TO PAY A FINE.

Under the Guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). Juanico has the burden of proving that he cannot afford to pay a fine, and he has not done so. He owns three pickup trucks, a mobile home, a 401(k) retirement savings account, and mechanic tools. See ¶ 88, at 18. He is in a far stronger financial position than many other defendants the Court has sentenced.

Once the Court decided that -- given his assets, the lack of dependents living in his home, and other factors -- it would fine Juanico, the burden shifted to him to prove he could not afford to pay that fine. He has not offered any evidence that he could not pay the proposed fine. While the difficulty a fine will cause is certainly relevant when he is arguing that the Court should not impose a fine, it is not relevant once the Court decides to impose a fine. At that stage, difficulty to the defendant is not the issue; the sole issue is whether he can pay the fine. Indeed, the evidence available supports the Court's finding, by a preponderance of the evidence, that he can pay the fine by selling his mobile home or taking out a loan equivalent to its value.

**IT IS ORDERED** that the Court sentences Defendant Brian J. Juanico to 18-months imprisonment to be followed by 3 years of supervised release, a $53,423.55 fine payable in 36 monthly installments of $1,484.00, to begin upon supervised release, and $300.00 in special assessments.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
David Adams
Novaline Wilson
  Assistant United States Attorneys
United States Attorney's Office for the District of New Mexico
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Irma Rivas
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

      *Attorneys for the Defendant*

- 50 -